IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Trevis Reid,                                                              Case No. 3:05CV7183 and 3:03CV7741

         Plaintiff,

v.                                                                       ORDER

Rexam Beverage Can Company,

         Defendant.

These are two consolidated employment discrimination lawsuits (filed in 2003 and 2005 respectively), in which plaintiff Trevis Reid is suing his former employer, Rexam Beverage Can Company. In his 2003 lawsuit, Reid claims Rexam: 1) retaliated against him in violation of O.R.C. § 4112.02 *et seq.* for filing an earlier race discrimination lawsuit; and 2) violated a collective bargaining agreement (CBA). In his 2005 lawsuit, Reid, who has been diagnosed as a schizophrenic, paranoid type, alleges Rexam fired him because of his disability (or perceived disability) in violation of O.R.C. § 4112.02 *et seq.* and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*[1]

I have jurisdiction under 28 U.S.C. § 1331.

---

[1] Reid also alleges Rexam violated Title VII of the Civil Rights Act of 1964, but becuase he has abandoned his race discrimination claims, I need not address them.

Pending are Rexam's motions[2] for summary judgment. For the reasons that follow, Rexam's motions shall be granted.

**Factual Background**

Reid began working for Rexam on June 11, 1996, as a palletizer operator at the company's Whitehouse, Ohio, plant. Reid had discipline and attendance problems at work.

On February 22, 2000, Reid returned to work from a three-day disciplinary suspension for excessive absenteeism. During lunch break Reid claimed that co-workers tried to kill him by poisoning his food. Reid went to the emergency room. The treating physician found nothing wrong with him. Rexam had Reid's food tested by an outside toxicology lab and the results came back negative. Reid claims the food was not stored properly to prevent tampering with the results.

Reid went on mental health medical leave shortly after that incident and ultimately remained on leave for more than three years.[3]

On March 3, 2000, Reid sued Rexam for race discrimination in the Lucas County, Ohio, Court of Common Pleas. After voluntarily dismissing the case without prejudice, Reid refiled the lawsuit on May 11, 2001.

In the re-filed case, Dr. Charles Burke, a psychiatrist, performed an independent medical examination on Reid. In his report, Dr. Burke stated Reid admitted he suffered from paranoia, often

---

[2] Although the two cases were consolidated, Rexam filed separate motions for summary judgment for the 2003 and 2005 lawsuits.

[3] From March 1, 2000, until February 26, 2002, Reid received weekly disability income benefits from work. Reid also applied for, and received, Social Security disability benefits during this time. Because this case is resolved on other grounds, I do not address the legal implications of Reid's receipt of Social Security benefits in this case. As such, the details about Reid's receipt of government benefits are irrelevant.

2

had homicidal or suicidal thoughts, and did not regularly take medication prescribed for him.[4] Dr. Burke diagnosed Reid as a schizophrenic, paranoid type.

On February 7, 2003, Rexam filed a motion for summary judgment. Around February 24, 2003, Reid called Raymond McClay, the human resources manager at Rexam's plant, and stated he (Reid) wanted to return to work, even though Reid's doctors had not released him to return to work.

On March 3, 2003, Dr. Gregory Forgac stated Reid could return to work, but did not address whether Reid had homicidal tendencies. McClay later told Reid that Rexam wanted additional medical information before approving his request. Although the CBA does not list specific guidelines for deciding whether an employee on medical leave is fit to work, the management rights clause of the CBA vests Rexam with authority to make such employment decisions. Reid never responded to McClay's request for additional information.

In analyzing Reid's request to resume working, McClay examined Reid's employment file at Rexam. At the time of Reid's request, his employment file contained allegations by Reid that co-workers had harassed him, attacked him, vandalized his personal belongings, and attempted to kill him with poison because of his race.[5] Many of these allegations were the basis for his race discrimination suit.

---

[4] Dr. Burke noted, *inter alia*, in his report, that Reid claimed to have been frequently pulled over and ticketed by police officers for no reason while driving to work. Reid additionally claimed that, on such occasions, on arriving at work, his Rexam supervisors would know about the police traffic stop. The report also stated that in 2000 Reid had a panic attack that caused him to drive his car into a parked truck, resulting in Reid's hospitalization. Reid also told Dr. Burke that in 1998 people were throwing dead chickens into his yard.

[5] For Reid's employment file, which documents the various allegations Reid made against co-workers and workplace threats, *see* Ex. I.

3

Reid's employment file also had reports of two separate incidents in which Reid made threats against co-workers. In December 20, 1998, Reid threatened to come to work with a shotgun and "take all the management people out." On January 25, 2000, Reid threatened to turn Rexam into "a real blood bath."

In the middle of March, 2003, Reid abruptly called McClay to claim he (Reid) was actually *not* cleared by his doctors to work. Because Reid's statement directly contradicted Dr. Forgac's recent recommendation, McClay sent Reid a letter on March 26, 2003, to document the conversation.

On March 27, 2003, the Lucas County Court of Common Pleas granted Rexam's motion for summary judgment and dismissed Reid's race discrimination case.

In May, 2003, Reid renewed his request to return to work, submitting medical forms from the two doctors who treated him, Dr. Forgac and Dr. Thomas Sherman. Those forms did not, however, address whether Reid still had suicidal and homicidal thoughts.

On June 12, 2003, McClay called Reid to inform him that Rexam would not grant his request to return to work. In reaching its decision, Rexam considered the duration, reason, and circumstances of Reid's medical leave, information and medical records from the return-to-work forms and discovery from Reid's race discrimination lawsuit. Rexam stated it did not accept the reports of Drs. Forgac and Sherman because they failed to address concerns, *inter alia*, about Reid's homicidal thoughts.

On June 20, 2003, Reid filed a grievance against Rexam for denying his return-to-work request. Rexam denied Reid's grievance. That grievance is awaiting arbitration.

Reid complained about Rexam's reliance on Dr. Burke's report and Rexam offered to pay for another independent medical examination by Dr. Joseph Mann. Before examining Reid, Dr. Mann reviewed Reid's medical records and informed Rexam on June 11, 2003, that Reid should not return to work. Nonetheless, after examining Reid that month, Dr. Mann issued a report stating Reid could work on a probationary basis for three months, provided Reid continued to receive treatment.

While examining Reid, Dr. Mann – who was to provide a neutral, third-party analysis of Reid's mental health – agreed to accept Reid as a patient. Dr. Mann's behavior created a conflict of interest.[6]

On a later visit to Dr. Mann's office, Reid became involved in an altercation with Dr. Mann's wife, Sigrid, who was the administrative assistant in the office. Reid had gone to Dr. Mann's office for a treatment session. At the end of the session, Dr. Mann showed Reid a copy of his June 29, 2003, report. Mrs. Mann told Reid to return the report when he finished reading it, but Reid refused to do so. After arguing with Mrs. Mann, Reid gave her the report, but then told her he had forgotten his keys on Dr. Mann's desk. Mrs. Mann went into Dr. Mann's office and saw that Reid had not left his keys in the room. When she went back into the waiting room, Reid had taken the report. Reid again refused to give Mrs. Mann the report. Reid and Mrs. Mann briefly struggled over the report, with both attempting to pull it away from the other. Reid finally took the report out of Mrs. Mann's hands, called her a racist, and then ran out of the office, never to return the report.

---

[6] Rexam correctly notes Reid does not dispute that Dr. Mann's action created a conflict of interest. Instead, Reid argues the conflict of interest only arose after Reid went to his first appointment with Dr. Mann, by which time the doctor had already written a draft of the report recommending that Rexam return Reid to work. Reid is mistaken. Rexam's view on this issue is correct: A conflict of interest arose during the initial interview when Dr. Mann agreed to take Reid as a patient – which was before Dr. Mann wrote his report.

Reid contends Dr. Mann told him it was his personal copy of the report. Other than that fact, however, Reid's version of the incident is more or less the same as that offered by the defendant. Reid admits, for example, he took the report from Mrs. Mann's desk and refused to return it despite Mrs. Mann's repeated requests and attempts to get it back.

Dr. Mann informed Rexam about the incident.[7] Rexam believed the incident was additional evidence that Reid would be unable to behave appropriately in the workplace. Rexam told Reid on August 25, 2003, that it was denying his request to return to work.

According to the CBA between the union and Rexam, when an employee's time on leave exceeds time in active service, that employee's seniority is broken. The CBA provides that an employee is automatically terminated when seniority is broken. Reid's time on leave exceeded his time in service on November 4, 2003, and thus Reid was automatically terminated under the CBA.

In connection with Reid's 2003 lawsuit, Dr. Burke performed a second independent medical evaluation of Reid in April, 2004. Dr. Burke's diagnosis remained as it had been: Reid had schizophrenia, paranoid type. Dr. Burke's 2004 medical report likewise made the same findings as his 2002 report. In sum, Dr. Burke stated Reid: 1) still suffered from schizophrenia, paranoid type; 2) refused to take medication; and 3) could not handle personal and financial affairs. Dr. Burke repeated his recommendation that Rexam refuse to let Reid return to work.

In August, 2004, Dr. Mann reviewed Dr. Burke's April, 2004, report and withdrew his June, 2003, report in which he recommended Rexam allow Reid to resume working. Dr. Mann's views changed because he had not known that Reid did not regularly take his medication. Dr. Mann stated he would not have cleared Reid to return to work in 2003 if he had known about Reid's lapses in

---

[7] The incident prompted Dr. Mann to stop treating Reid.

taking medication. Reid contends Dr. Mann was actually aware of that situation when Dr. Mann issued his earlier medical report in 2003.

## Discussion

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In viewing the evidence, I must draw all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Best v. Cyrus*, 310 F.3d 932, 934 (6th Cir. 2002); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Bell v. Marinko*, 367 F.3d 588, 591 (6th Cir. 2004) (citing *Shah v. Deaconess Hosp.*, 355 F.3d 496, 498 (6th Cir. 2004)).

### A. Employment Discrimination Claims

Reid's 2003 lawsuit alleges Rexam violated O.R.C. § 4112.01 *et. seq.* by refusing to allow him to return to work in retaliation for suing Rexam in 2001 for racial discrimination. In the 2005 complaint, Reid alleges Rexam's firing of him violated the Americans with Disabilities Act and O.R.C. § 4112.02.[8] I will deal with the employment discrimination claims together because the law is, to a large extent, substantially the same as to both claims.

---

[8]

Reid's memorandum in opposition to Rexam's motion for summary judgment presented no argument in defense of Reid's federal and state race discrimination claims. Reid has abandoned those claims.

Both the retaliation and disability discrimination claim are based on circumstantial evidence and therefore subject to the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972). Under this framework, the plaintiff has the initial burden of presenting evidence to establish a *prima facie* case. *McDonnell Douglas*, 411 U.S. at 802.

If a plaintiff establishes a *prima facie* case, the defendant must articulate a legitimate, non-discriminatory reason for its employment action. *McDonnell Douglas*, 411 U.S. at 802; *Peterson*, 133 Ohio App. 3d at 727. If the defendant provides a legitimate reason for its action, the plaintiff must demonstrate that the employer's proffered reason is a pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 802; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

The elements of a *prima facie* case of retaliation are different from the elements of a *prima facie* case of disability discrimination.[9] In neither claim, however, is the *prima facie* case crucial to

---

[9]

A *prima facie* case of retaliation in violation of O.R.C. § 4112.02 exists if 1) the plaintiff engaged in a protected activity, 2) the employer subjected the plaintiff to an adverse employment action, and 3) there is a casual link between the first two elements – i.e., the plaintiff's act of engaging in protected activities motivated the employer to commit the adverse employment action. *Peterson v. Buckeye Steel Casings*, 133 Ohio App. 3d 715, 727 (1993); *see also Hall v. Banc One Mgmt. Corp.*, 2006 WL 465109, *5 (Ohio Ct. App.); *Dargart v. Ohio Dept. of Transp.*, 2005 WL 894868, *4 (Ohio Ct. Cl.).

Likewise, to establish a *prima facie* case of disability discrimination under O.R.C. § 4112.02, a plaintiff must be 1) a disabled person under the ADA's definitions, 2) qualified to perform essential functions of his job with or without reasonable accommodation, and 3) have suffered an adverse employment action because of his disability. *McKay v. Toyota Motor Mfg.*, U.S.A., 110 F.3d 369, 371 (6th Cir. 1997).

Ohio courts "look to the regulations and cases interpreting the federal Act for guidance in our interpretation of Ohio law." *City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio 3d 569, 573 (1998).

the outcome here. That is because even assuming, *arguendo*, that Reid could establish *prima facie* cases, both would fail because Reid cannot establish pretext.[10]

The plaintiff can satisfy his burden of showing pretext by presenting evidence that the defendant's reasons: 1) lacked a factual basis; 2) were not the actual reasons for the employment action; or 3) were insufficient to justify or explain the defendant's action. *Logan v. Denny's, Inc.*, 259 F.3d 558, 567 (6th Cir. 2001).

A plaintiff cannot satisfy the burden of proving pretext in a discrimination or retaliation claim by, without more, questioning the employer's business judgment. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116-17 (6th Cir. 2001); *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004). If an employer honestly believes the articulated nondiscriminatory reasons for an adverse employment action, a court will not consider those reasons pretextual merely because that reasoning is later proven incorrect. *Majewski*, 274 F.3d at 117. A federal court may not second-guess an employer's business judgment. *Hedrick v. W. Reserve Care*

---

[10]

While Reid's 2003 employment discrimination claim alleges Rexam retaliated against Reid for filing a race discrimination lawsuit, his 2005 disability discrimination claim attacks Rexam's termination of him. In his 2005 lawsuit, Reid alleges that Rexam violated the ADA by firing him because of his disability or perceived disability (his mental health condition). Rexam argues Reid's termination was automatic under the terms of the CBA and not a result of disability discrimination.

Reid began to work for Rexam on June 11, 1996, and went on mental health medical leave on February 22, 2000. Reid's seniority was broken on November 4, 2003, because at that point his time on medical leave exceeded his time in active service on the job. As per the CBA, Reid's employment was automatically terminated as of the date his seniority was broken. Reid contends his automatic termination violated the ADA.

To the extent that Reid was automatically terminated under the CBA because Rexam would not let Reid return to work, the facts that form the basis of both the retaliation and disability discrimination claims are the same.

9

*Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) ("Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments." ) (citation and quotation omitted).

Here, Rexam has proffered a legitimate, non-retaliatory business reason for refusing to let Reid return to work: namely, its concerns that Reid would be a safety threat to himself and co-workers at the plant.[11] Rexam had substantial evidence to support this belief.

When making its decisions, Rexam knew Reid: 1) had been absent from work for three years due to a mental health condition; 2) did not regularly take his medication; 3) had suicidal and homicidal thoughts; 4) falsely accused co-workers of poisoning him; and 5) engaged in bizarre and threatening behavior at a doctor's office. (*See* Doc. 55-1 at 12-13).

Rexam's determination that Reid was a safety threat to the plant was based, in part,[12] on Reid's prior threats to bring a shotgun to work and kill plant managers in a "bloodbath." It was a legitimate exercise of its business judgment for Rexam to consider those prior threats when making its decision.[13]

---

[11] Because my decisions rests on Rexam's concerns for plant safety, I need not to reach the issue of whether Reid was, absent safety concerns, otherwise a qualified employee capable of performing his job.

[12] Rexam's decision to refuse Reid's request to return to work was based on Reid's employment records, medical records, and the reports from various doctors. Reid's employment records also contained details of Reid's numerous false allegations that co-workers harassed, attacked, and attempted to kill him with poison.

[13] Reid does not deny he made the threats. Instead, he argues that because he made the threats in 1998 and 2000, they should not have barred his return to work. This assertion simply challenges Rexam's business judgment in taking those threats into consideration.

In response, Reid refers to three doctors' reports approving his return to work. Those reports, however, do not address Reid's admitted prior homicidal threats and thoughts.[14] While those reports may be relevant to the question of whether Rexam made the correct decision, because those reports do not consider the specific conduct justifying Rexam's decision, they are simply not probative, one way or the other, of the issue of whether Rexam's articulated reason was pretextual.

It is not enough for Reid to disagree with Rexam's reasoning and conclusion, Reid must show that Rexam's articulated reason was a pretext and that its decision was based on an improper desire to retaliate against him. *Rowan*, 360 F.3d at 550; *see also Majewski*, 274 F.3d at 117 (discussing the "honest belief" rule, under which a court will not find a reason pretextual if an employer had an honest – although incorrect – belief in its non-retaliatory reason for an adverse employment action). This is not simply a matter of adding up all of the doctors who issued reports and counting whether more doctors cleared Reid to return to work. Likewise, the test is not whether the most recent doctor's report approved Reid for work at the plant.

Therefore, summary judgment is warranted on all of Reid's employment discrimination claims because he fails to show Rexam's articulated reason was a pretext.[15]

---

[14] The reports did include questions about whether Reid was likely to cause injury to himself or others while performing job tasks. The doctors answered those questions in the negative. The reports did not, however, address incidents specific to Reid, i.e., his prior threats. There are other – entirely legitimate – grounds to question the reliability of the three reports approving Reid for work. I need not, however, address that issue because all the reports on which Reid relies failed to address the pertinent issue: whether – in light of Reid's prior behavior – he was a safety risk. In any event, Reid cannot show pretext merely by questioning Rexam's business judgment and arguing that Rexam should have focused on other evidence.

[15] There is an additional reason why Reid's federal (ADA) disability discrimination claim fails: Reid did not file a timely EEOC charge.

**2. Breach of CBA Claims**

Reid's 2003 and 2005 lawsuits also accuse Rexam of breaching the CBA by refusing to let him return to work and firing him. The claims fail for the same reason.

Employees asserting contract grievances must use the grievance procedure agreed to by the union and employer. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965). An employee

---

The same time limits and administrative procedures apply to Reid's ADA disability discrimination claim as a Title VII race discrimination claim. *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 309 (6th Cir. 2000). To bring a Title VII race discrimination suit or an ADA disability discrimination suit, a plaintiff must file a charge with the Equal Employment Opportunity Commission (EEOC) within 300 days of the alleged discriminatory acts. 42 U.S.C. § 2000e-5(e). The statute bars a party from initiating a civil action if the deadline is missed. *Gould v. Case W. Reserve Univ.*, 369 F. Supp. 915, 917-18 (N.D. Ohio 2005).

Reid's EEOC charge of discrimination was filed on November 9, 2004, past the 300-day deadline as measured by his November 4, 2003, automatic termination.

Reid argues he did not file a timely charge because he did not learn Rexam terminated his employment until August 24, 2004, at McClay's deposition. (2005 Compl. at 13). Reid argues, *inter alia*, he believed his active grievance would prevent his seniority from being broken. Reid's own pleadings and testimony, however, belie his contention that he was unaware Rexam had fired him.

Specifically, Reid knew by his 2003 lawsuit – which alleged "constructive discharge" – that Rexam was not letting him return to work. Reid also knew in 2003 that an employee's seniority was broken once time on medical leave exceeded time in active service, and that the CBA subjected employees to automatic discharge once seniority was broken. Additionally, Reid admitted he calculated in 2003 that his leave would exceed his length of service around November 10, 2003.

Thus, Reid cannot claim ignorance of the CBA clause providing for the automatic termination of his employment. Reid's eventual automatic termination should not have been a surprise – the information was available to Reid in the CBA and there is no injustice in requiring him to meet the requirements of the federal statute. Even when viewing the case in the light most favorable to Reid, the facts show that by 2003, Reid was well aware that Rexam was not welcoming him back work.

Therefore, Reid's federal ADA claim is barred for failure to file a timely EEOC charge.

Reid asks that I apply equitable tolling and permit his federal discrimination claim to escape the 300-day deadline requirement. Courts reserve equitable tolling for exceptional circumstances, such as situations where an employer tricked an employee into missing a deadline. *Graham-Humphreys v. Memphis Brooks Museum of Art*, 209 F.3d 552, 560-61 (6th Cir. 2000). This case does not involve any trickery or other exceptional circumstances, so equitable tolling is not warranted.

asserting a grievance must exhaust contractual remedies under the CBA to avoid being barred from bringing suit alleging breach of the CBA. *Vaca v. Sipes*, 386 U.S. 171, 184 (1967); *see also Williamson v. Lear Corp.*, 2006 WL 1359968, *3 (6th Cir. 2006); W.J. Dunn, *Exhaustion of Grievance Procedures or of Remedies Provided in Collective Bargaining Agreement as Condition of Employee's Resort to Civil Courts for Assertedly Wrongful Discharge*, 72 A.L.R.2d 1439, §2.

Article XV of the CBA describes the procedures for filing a grievance for breach of the CBA. The grievance process requires the employee and employer to submit disputes to arbitration.

Reid filed a grievance against Rexam's decision to deny his request to return to work. That grievance is in the arbitration stage. Thus, Reid filed this lawsuit while his grievance was pending.

Reid, therefore, has failed to exhaust administrative remedies: he sued in this court without waiting for the conclusion of the CBA grievance process. Because Reid cannot file suit until such remedies have been exhausted, these claims are dismissed without prejudice.

## Conclusion

It is therefore,

ORDERED that Rexam's motions for summary judgment be, and the same hereby are granted.

So ordered.

/s/ James G. Carr
James G. Carr
Chief Judge